**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

JAY J. BAUER,                    )
    **Plaintiff,**                )
                   )
      **v.**                      )          **Case No. 1:13-cv-93**
                   )
**ERIC H. HOLDER JR., ATTORNEY**   )
**GENERAL, DEPARTMENT OF**         )
**JUSTICE,**                      )
    **Defendant.**               )

## MEMORANDUM OPINION

At issue on cross-motions for summary judgment in this Title VII[1] case is whether the Federal Bureau of Investigation's ("FBI") gender-normed physical fitness test ("PFT") that all FBI New Agent Trainees ("NATs") must pass constitutes impermissible disparate treatment under Title VII. As a NAT, plaintiff failed to perform the 30 push-ups required for male NATs, and argues that this requirement, given that female NATs are required to perform only 14 push-ups, discriminates against him on the basis of sex and thus violates Title VII. Defendant argues that the PFT does not involve impermissible discrimination because the gender-normed standards are based on innate physiological differences between males and females and these standards impose no greater burden on males than on females.

The parties have extensively briefed and argued the various questions presented and the matter is now ripe for resolution.

---

[1] Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et seq.*

**I.**[2]

## A. The Parties

Plaintiff Jay Bauer is a 40-year-old[3] male who currently resides in Mount Prospect, Illinois with his wife and two children. Compl. ¶¶ 2-3. Plaintiff received his Bachelor of Science, Master's, and Ph.D. degrees from Northwestern University in 1996, 2001, and 2004, respectively. Plaintiff first decided that he wanted to become an FBI Special Agent after the tragic events of September 11, 2001. Plaintiff now serves as an FBI Intelligence Analyst in the FBI's Chicago Division, a position he accepted after failing to pass the PFT following 22 weeks in the FBI's New Agent Training Program ("NATP").

Defendant Eric Holder, Jr. is the Attorney General at the U.S. Department of Justice. The FBI is a bureau of the U.S. Department of Justice, and thus the Attorney General is the proper defendant in a Title VII action against the FBI as the head of the relevant department. *See* 42 U.S.C. § 2000e-16(c).

## B. The PFT

The NATP is designed (i) to ensure that, upon graduation, a NAT has "attained the necessary *proficiencies* in specialized knowledge, skills, and abilities needed to effectively perform the duties of a[n] FBI [Special Agent]" and (ii) "to assess each NAT's *suitability* for the [Special Agent] position as measured by the NAT's level of conscientiousness, cooperativeness, emotional maturity, initiative, integrity and judgment." Stip. ¶ 12 (emphasis in original). To complete the NATP successfully, NATs must meet designated requirements in each of four categories: (1) academics, (2) firearms training, (3) physical/defensive tactics training, and (4)

---

[2] Unless otherwise noted, the facts recited here are derived from paragraphs 1-55 of the parties' Joint Stipulation of Facts [hereinafter Stip.].

[3] Bauer Dep., Def.'s Summ. J. Br. Ex. E, at 78:12 [hereinafter Bauer Dep.].

practical applications/skills training. The Physical Training program and the PFT are components of the physical/defensive tactics training category. A document distributed to all NATs titled "Rules, Regulations and Requirements at the FBI Academy for New Agent Trainees" ("Requirements Document") includes the requirements and standards for each of these four categories and provides that failure to demonstrate proficiency in any one of the four categories could result in dismissal from the NATP.

The Physical Training program for NATs at the FBI Academy is important for at least two reasons: (i) "a basic level of fitness and conditioning is essential for a NAT to perform at his/her best in all aspects of training and to successfully complete the entire fast-paced training program without serious physical injury and undue mental stress," and (ii) "a NAT's level of fitness serves as a foundation for his/her ability to effectively apply principles and non-deadly force alternatives being taught in the [defensive tactics] program." Stip. ¶ 25. Successful completion of an Academy-administered PFT, considered a "key component" of the Physical Training program, is an FBI Academy graduation requirement. *See* Stip. ¶ 26. The PFT contains four individual tests: (1) one-minute sit-ups, (2) 300 meter run, (3) push-ups to maximum, and (4) 1.5 mile run. Each NAT must achieve a minimum cumulative score of twelve points with at least one point in each of the four events. Each PFT event is scored on a ten-point scale, for a maximum overall score of 40 points. One point is awarded for achieving the minimum standard in an event, and three points are awarded for reaching the mean. To achieve one point in each of the four events, NATs must meet the following minimum standards by sex:

| Event | Male | Female |
|---|---|---|
| Sit-ups | 38 | 35 |
| 300 meter run | 52.4 sec | 64.9 sec |
| Push-ups | 30 | 14 |
| 1.5 mile run | 12:42 min | 13:59 min |

The PFT was implemented in 2004 as a mandatory physical fitness test for all NATs. The process by which the FBI selected the PFT events and minimum passing standards is recorded in two reports, both authored by Amy D. Grubb, Ph.D., an Industrial/Organizational Psychologist employed by the FBI:[4] (i) a 2003 study titled "Validation of a Physical Training Test: Report of Standards, Findings, and Recommendations" ("2003 Grubb Report")[5] and (ii) a 2005 study titled "The Physical Fitness Test: An Evaluation of the Standards and Report of Validation Evidence" ("2005 Grubb Report").[6] Minimum passing scores for the PFT were developed through a pilot study of 324 NATs (260 male and 64 female), in which the FBI set minimum passing scores for each event at one standard deviation below the mean performance for each sex.[7] Stip. ¶ 126, 131; 2003 Grubb Report at 6. Defendant chose to set gender-specific minimum standard and mean scores in order to take account of the innate physiological differences that exist, on average, between males and females. 2003 Grubb Report. In the case of the push-up test, this process

---

[4] Charles Greathouse, a Supervisory Special Agent with the FBI's Physical Training Unit at Quantico, worked with Dr. Grubb in developing the PFT.

[5] Def.'s Summ. J. Br. Ex. G [hereinafter "2003 Grubb Report"].

[6] Def.'s Summ. J. Br. Ex. I [hereinafter "2005 Grubb Report"].

[7] The 2005 Grubb Report considered various alternative scoring methods, including the 30-39 age group norms published by the Cooper Institute for Aerobic Research ("Cooper Institute"), which norms are derived from the largest known set of fitness data in the United States. 2005 Grubb Report at 35-36. In the end, the FBI chose to develop its own minimum passing standards rather than to rely on the Cooper Institute norms because the Cooper Institute data reflects fitness norms for the general population, not the more specific law enforcement population, which, in general, has a higher level of fitness than the general population. *Id.* As of 2009, the Cooper Institute norms for the 30-39 age group at the 60th percentile were 30 push-ups for men and 15 push-ups for women, and norms for the 30-39 age group at the 40th percentile were 24 push-ups for men and 11 push-ups for women. The Cooper Institute: Physical Fitness Assessments and Norms for Adults and Law Enforcement, Pl.'s Summ. J. Br. Ex. 4, at 32, 40. The Cooper Institute norms also differ from the FBI PFT in the key respect that the PFT tests push-ups to maximum number without a time limit, while the Cooper Institute norms require that the number of push-ups be completed in one minute. *Id.*; 2003 Grubb Report at 2.

resulted in the minimum standard score being set at the 15.7[th] percentile for males and at the 15.9[th] percentile for females. *Id.* at 12.

The record reflects that the PFT is the last mandatory physical fitness test that FBI Special Agents must pass during their FBI careers. There is no required physical fitness test for incumbent FBI Special Agents, despite the fact that the FBI's own validation study suggested that the FBI consider adopting a mandatory physical fitness test for incumbent Special Agents.[8] The record also reflects that the FBI encourages incumbent Special Agents to take a voluntary fitness test using norms for persons in the 30-39 year age group published by the Cooper Institute—24 push-ups for men and 11 for women at the 40th percentile—as suggested minimum fitness goals.

## C. Plaintiff's Performance on the PFT

By letter dated February 24, 2009, the FBI offered plaintiff an appointment as a Special Agent and required plaintiff, if he accepted the offer, to report to the FBI Academy in Quantico, Virginia on March 1, 2009. Thereafter, on the appointed date, plaintiff, then age 35,[9] entered on duty with the FBI NAT Class 09-08 at the FBI Academy to begin the NATP. When he started the NATP on March 1, 2009, plaintiff received the Requirements Document and acknowledged, in writing, that he understood and agreed to the document's terms.

Plaintiff took the PFT a total of seven times, twice at the at the FBI's Milwaukee Field Office prior to starting the NATP and five times during the NAPT at the FBI Academy in Quantico. He attained satisfactory passing scores in each component of the NATP other than the

---

[8] 2003 Grubb Report at 2 ("[I]mplementation of a fitness assessment for on-board agents should be considered (with age-appropriate norms) to ensure continued safe performance in the Special Agent position, as well as to increase the defensibility of any personnel actions taken at the applicant or NAT phase of selection.").

[9] Bauer Dep. at 78:12.

PFT,[10] and his NAT class selected him as "class leader" and "class spokesperson" to represent the class at graduation.[11] Plaintiff passed the push-up test the second time he took the PFT at the Milwaukee Field Office, but failed it every other time. The following chart records each time plaintiff took the PFT and his score on each occasion:

| Date | Location | Sit-ups | Points | 300 meter | Points | Push-ups | Points | 1.5 mile | Points | Total Points |
|------|----------|---------|--------|-----------|--------|----------|--------|----------|--------|--------------|
| 10/31/2008 | FBI Milwaukee Field Office | 48 | 5 | 43 sec | 7 | 25 | 0 | 10:50 min | 4 | 16 |
| 1/12/2009 | FBI Milwaukee Field Office | 51 | 6 | 44 sec | 6 | 32 | 1 | 11:25 min | 3 | 16 |
| Week 1 NATP | FBI Academy Quantico | 40 | 2 | 42.6 sec | 8 | 26 | 0 | 10:49 min | 4 | 14 |
| Week 7 NATP | FBI Academy Quantico | 47 | 4 | 43.4 sec | 7 | 25 | 0 | 10:24 min | 5 | 16 |
| Week 14 NATP | FBI Academy Quantico | 50 | 6 | 43.7 sec | 7 | 28 | 0 | 10:45 min | 4 | 17 |
| Week 18 NATP | FBI Academy Quantico | 51 | 6 | 43.8 sec | 7 | 27 | 0 | 11:09 min | 4 | 17 |
| Week 22 NATP | FBI Academy Quantico | 49 | 5 | 44.1 sec | 6 | 29 | 0 | 10:57 min | 4 | 15 |

Females in plaintiff's NAT Class 09-08 passed the PFT and became Special Agents with the following scores:

| NAT | Sit-ups | Points | 300 meter | Points | Push-ups | Points | 1.5 mile | Points | Total Points |
|-----|---------|--------|-----------|--------|----------|--------|----------|--------|--------------|
| Female A[12] | 39 | 2 | 54.3 sec | 5 | 16 | 1 | 10:49 min | 4 | 14 |
| Female B | 42 | 3 | 54.3 sec | 5 | 24 | 3 | 12:51 min | 3 | 14 |
| Female C | 46 | 4 | 54.7 sec | 5 | 19 | 2 | 12:26 min | 4 | 15 |
| Female D | 41 | 3 | 55.2 sec | 5 | 15 | 1 | 11:50 min | 5 | 14 |

---

[10] *See* Stip. ¶¶ 14-24.

[11] Stip. ¶¶ 78-79.

[12] The scores for Female A, taken directly from Stip. ¶ 36, presumably contain an error, as 2 + 5 + 1 + 4 = 12, not 14.

On July 30, 2009, during week 22 of plaintiff's NATP, plaintiff was able to complete only 29 push-ups in the PFT, rather than the required 30. Immediately following this event, FBI personnel Melinda Casey, Gerald Jackson, and Jason VanGoor met with plaintiff and informed him that he had three "options": (i) to resign as a Special Agent and preserve the *possibility* of working as an FBI Intelligence Analyst in Chicago; (ii) to resign and forgo the *possibility* of any future position with the FBI; or (iii) to be terminated from employment with the FBI. Plaintiff was required, then and there, to choose one of the three options. He chose the first option, and FBI personnel provided him with a template resignation letter addressed to then-FBI Director Robert Mueller that gave plaintiff precisely what he must say to resign from the NATP while preserving the possibility of being considered in the future for an FBI Intelligence Analyst position. Plaintiff, as directed, then and there handwrote and signed a resignation memorandum addressed to Director Mueller using the provided template. Plaintiff's decision to choose that option was, in his view, the only way to mitigate damages at that time in terms of being able to provide for his family. After resigning, plaintiff left Quantico and drove to Chicago, where his wife and two children were then living. Two weeks later, the FBI offered plaintiff an Intelligence Analyst position, and he accepted.

## D. The Special Agent and Intelligence Analyst Positions

There are two "career paths" listed on the FBI's external website: "Special Agent" and "Professional Staff." The Intelligence Analyst position is considered a "support" position within the FBI, and appears under the "Professional Staff" designation, alongside numerous other positions including lawyers in the Office of General Counsel, scientists and engineers specializing in fields ranging from chemistry to cryptography, experts in communications and surveillance, and linguists.

FBI Special Agents are responsible for conducting investigations and enforcing federal law. Specifically, FBI Special Agents:

> may work on matters including terrorism, foreign counterintelligence, cybercrime, organized crime, white collar crime, public corruption, civil rights violations, financial crime, bribery, bank robbery, extortion, kidnapping, air piracy, interstate criminal activity, fugitive and drug trafficking matters, and other violations of federal statutes.

Stip. ¶ 48. As a general matter, male and female Special Agents are expected to perform the same physical tasks at the same level of job performance.

Duties of an FBI Intelligence Analyst include:

> advising on, administering, supervising, or performing work in the collection, analysis, evaluation, interpretation, and dissemination of information on political, economic, social, cultural, physical, geographic, scientific, or military conditions, trends, and forces in foreign and domestic areas that directly or indirectly affect the national security.

Stip. ¶ 52. FBI Intelligence Analyst "positions require a basic knowledge and understanding of one or more of the natural or social sciences, engineering, or military science, but do not demand, as a primary qualification requirement, full knowledge of the current state of the art." *Id.*

Plaintiff's specific duties as an Intelligence Analyst include being embedded in an investigative squad of Special Agents in the field to provide support on active cases. In this capacity, an Intelligence Analyst must: (i) assess and communicate real-time analytic judgments regarding specific threats and intelligence gaps, (ii) understand emerging threats to enhance domain knowledge and exploit collection opportunities, (iii) bridge operational squads by identifying collection opportunities and gaps, and (iv) help to assure timely and accurate reporting of intelligence.

**E. This Case**

On April 2, 2012, plaintiff filed the instant case in the United States District Court for the Northern District of Illinois, seeking reinstatement to the position of FBI Special Agent. On January 23, 2013, the case was transferred to this district pursuant to 28 U.S.C. § 1404(a). On November 8, 2013, the parties filed cross-motions for summary judgment. The precise questions presented in these cross-motions for summary judgment are:

i.   Whether plaintiff has established that an adverse employment action occurred, given that he opted to resign rather than be terminated to preserve the option of working, in the future, for the FBI as an Intelligence Analyst.

ii.  Whether defendant's use of gender-normed PFT standards is discriminatory under 42 U.S.C. § 2000e-2(a)(1) ("§ 2000e-2(a)(1)"), which prohibits employment discrimination generally, or under 42 U.S.C. § 2000e-2(*l*) ("§ 2000e-2(*l*)"), which specifically prohibits employers from using discriminatory standards on employment related tests.

iii. Whether, assuming defendant's use of gender-normed PFT standards is discriminatory, defendant has nonetheless provided a lawful justification for using the differential standard under the bona fide occupational qualification ("BFOQ") defense.

**II.**

The summary judgment standard is too well-settled to merit extended discussion, and the parties do not dispute this standard. Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56, Fed. R. Civ. P. It is settled that "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). On the other hand, a genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**III.**

To prevail on his Title VII claim, plaintiff must show that he suffered an adverse employment action as a result of Title VII disparate treatment.[13] The parties dispute whether an adverse employment action occurred. Plaintiff claims he was effectively terminated, which is clearly an adverse employment action, because his resignation was involuntary and coerced. Defendant contends that plaintiff voluntarily resigned because he wanted to take advantage of the possibility of a future position as an FBI Intelligence Analyst.

Analysis properly begins with addressing this issue because if, as defendant contends, plaintiff cannot establish an adverse employment action, plaintiff's Title VII claim fails and defendant is entitled to summary judgment. On the other hand, if plaintiff has established that he was coerced into resigning and that his resignation amounted to termination, it will then be necessary to address the sole remaining disputed element of a Title VII disparate treatment claim, namely whether the FBI's NATP PFT is discriminatory under Title VII.

The facts pertinent to whether plaintiff's resignation was voluntary or involuntary are easily summarized. It is undisputed that when plaintiff performed only 29 push-ups rather than the required 30 push-ups during week 22 of his NATP, he was required to meet immediately with FBI personnel, who informed plaintiff to choose immediately among the following three "options": (i) to resign as a Special Agent and preserve the *possibility* of working in the future as an FBI Intelligence Analyst in Chicago; (ii) to resign and forgo the *possibility* of any future position with the FBI; or (iii) to be terminated from employment with the FBI. Stip. ¶ 37. In addition to the requirement that he make his choice immediately, plaintiff was told that if he

---

[13] The Fourth Circuit has made clear that plaintiff must prove an adverse employment action to establish a *prima facie* case of disparate treatment. *Gerner v. Cnty. of Chesterfield, Va.*, 674 F.3d 264, 266 (4th Cir. 2012).

chose to resign, he was required, then and there, to handwrite a resignation memorandum to then-FBI Director Mueller using a template provided to him by the FBI personnel with whom he was meeting. Stip. ¶ 39. Plaintiff acceded to these requirements; he resigned immediately by using the FBI's template to handwrite a letter of resignation to the FBI Director. Stip. ¶ 40. Thus, plaintiff "chose" the first option and eventually accepted a position he was offered later as an Intelligence Analyst in Chicago. Stip. ¶ 38.[14]

The following legal principles govern whether an employer's specific action constitutes an adverse employment action. It is clear in this circuit that, "[a]n adverse employment action is a discriminatory act which adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375-76 (4th Cir. 2004) (citing *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001)) (internal quotations omitted). It is also clear that "conduct short of ultimate employment decisions can constitute adverse employment action." *Id.* Job reassignments may or may not constitute adverse employment actions, depending on the circumstances. Thus, whereas "[t]he mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action," a reassignment with some "detrimental effect" such as "any decrease in compensation, job title, level of responsibility, or opportunity for promotion" can amount to an adverse action. *Id.* at 376 (citing *Von Gunten*, 243 F.3d at 868; *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999)) (internal quotations omitted). Further, where an employee resigns, the resignation may nonetheless amount to a constructive discharge, and thus meet the adverse employment action

---

[14] In their cross-motions for summary judgment, neither party argued that there are triable issues of fact relevant to the adverse employment action determination.

element, where the resignation is deemed to be coerced or involuntary.[15] A constructive

discharge via an involuntary resignation may be established by "looking to the circumstances of

the resignation to determine whether the employee was denied the opportunity to make a free

choice." *Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 167, 174 (4th Cir. 1988).[16] This is

so because an employer cannot avoid its legal obligations and liability "by the simple expedient

of forcing involuntary 'resignations.'" *Id.* at 173. Specifically, a lack of free choice may be

established by evidence of (i) misrepresentation or deception or (ii) duress or coercion. *Id.* Here,

there is no allegation of misrepresentation or deception; rather, plaintiff contends that his

resignation was effectively coerced.

In *Stone*, the Fourth Circuit made clear that "a resignation may be found involuntary if on

the totality of circumstances it appears that the employer's conduct in requesting resignation

effectively deprived the employee of free choice in the matter." 855 F.2d at 174-75. Specifically,

*Stone* identifies four factors to consider in this regard: (1) whether the employee was given some

---

[15] *See Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1354 (4th Cir. 1995) (quoting *Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 242-43 (5th Cir. 1993)) ("The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into involuntary resignation, then the employer has committed a construct[ive] discharge."); *see also Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011) ("There is no dispute that [plaintiff's] forced resignation constitutes an adverse employment action.").

[16] *Stone*, defendant's principal authority on this issue, is a 42 U.S.C. § 1983 civil rights action in which the plaintiff claimed that his termination constituted a deprivation of his constitutionally protected property interest in continued employment without due process of law. 855 F.2d at 172. Notwithstanding that *Stone* was not a Title VII case, it is appropriate authority here because the Fourth Circuit has consistently cited *Stone* approvingly in Title VII and other discrimination cases. *See Hooper v. State of Md., Dep't of Human Res.*, 45 F.3d 426, *3 (4th Cir. 1995) (citing *Stone* for the proposition that in a Title VII claim "[i]f the employment action was voluntarily taken by the employee, the action can not [sic] be said to have been motivated by racial discrimination on the part of the defendant employer"); *Shealy v. Winston*, 929 F.2d 1009, 1010 (4th Cir. 1991) (applying the *Stone* factors to a constructive discharge analysis in an Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.*, case).

alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether the employee was permitted to select the effective date of resignation. *Id.* These factors, applied here, point persuasively to the conclusion that plaintiff's resignation was coerced and therefore involuntary.

To begin with, plaintiff was offered no real alternative to immediate resignation. Indeed, the sole alternative to immediate resignation offered to plaintiff was immediate termination. In other words, plaintiff had no alternative, no choice, but to accept the immediate ending of his FBI Special Agent status. He could choose only how this would occur: immediate resignation or immediate termination. Of course, this is no genuine choice or alternative at all; it is rather a variant of the proverbial Hobson's choice where the so-called "choice" is wholly illusory and is in fact no choice at all.[17] Here, the only option plaintiff was offered was the termination of his FBI Special Agent status.

The remaining *Stone* factors also weigh decisively in favor of the conclusion that plaintiff's resignation was involuntary. Although it appears that plaintiff understood the nature of the choice before him, he was not given a reasonable time in which to make his decision, nor was he permitted to select the effective date of resignation or any other terms of his resignation. Rather, plaintiff was required to make his decision right then and there, and after he opted to resign, effective immediately, plaintiff was required, on-the-spot, to handwrite his resignation letter using an FBI-provided template. Thus, the totality of the circumstances makes

---

[17] The expression Hobson's choice is believed to have originated with the Cambridge, England stable owner Thomas Hobson (1549-1631), who, it is said, gave his customers the "choice" of taking the horse closest to the door—the horse that Hobson offered them—or taking no horse at all. *See* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 404 (2d ed., 1995). Like Hobson's customer, plaintiff was offered no true choice or alternative to ending his FBI Special Agent status. The possibility of future employment with the FBI does not weaken this analogy.

unmistakably clear that plaintiff lacked free choice in his resignation. Indeed, it is worth noting that defendant itself, as the record reflects, repeatedly referred to plaintiff's so-called voluntary resignation more accurately as a "dismissal" or "removal." *See, e.g.,* Stip. ¶¶ 76-77. Accordingly, plaintiff's resignation was involuntary and thus amounts to a constructive discharge, which qualifies as an adverse action under Title VII. *See Martin,* 48 F.3d 1343; *Coston v. Hooper,* 885 F.2d 864 (4th Cir. 1989).

Defendant argues that because the *Stone* court found that plaintiff's resignation to be voluntary, the same result should obtain here. Yet, the instant case is clearly factually distinguishable from *Stone.* In *Stone,* the court found that the plaintiff's resignation was voluntary because he "dictated the terms of his resignation himself, and he drove a hard bargain, demanding that he be given a clean record, a delayed effective date, and a full year's salary." *Stone,* 855 F.2d at 177-78. Nothing of the sort happened here. Indeed, the *Stone* court acknowledged that under slightly different circumstances, the fact that the plaintiff was forced to decide between resignation and termination could constitute an involuntary resignation. *Id.* (citing *Paroczay v. Hodges,* 297 F.2d 439 (D.C. Cir.1961) (denying summary judgment because the plaintiff's resignation, when made under the threat of immediate misconduct charges, could be deemed involuntary)). Far from being similar to *Stone,* this case is more analogous to *Coston,* which held that a resignation "was so involuntary that it amounted to constructive discharge" where the plaintiff there resigned rather than face immediate termination because, unlike *Stone,* there were no "substantive negotiations or discussions" over the terms of plaintiff's resignation." 885 F.2d at *5. Here, as in *Coston,* there was no negotiation; the termination of plaintiff's status as a Special Agent was clearly non-negotiable.

Nor is this conclusion altered by the fact that, following his forced resignation, plaintiff accepted later-offered alternate employment with the FBI. Yet, defendant argues that this fact means that plaintiff's resignation was the equivalent of a reassignment and thus should be analyzed as a reassignment rather than as a termination. Notably, defendant has failed to produce a single case in which an analogous factual scenario was considered to be a reassignment. The undisputed factual record shows that plaintiff was given and chose the option to "*resign* and *preserve the possibility* of working as an Intelligence Analyst for the FBI in Chicago." Stip. ¶ 37 (emphasis added). Thus, as the parties' joint stipulation of facts states, plaintiff resigned as a special agent and was *subsequently* offered a different position within the FBI; he was not reassigned. Stip. ¶¶ 40, 44.

In sum, the summary judgment record makes clear that plaintiff suffered an adverse employment action, as his resignation was coerced and thus did not constitute a voluntary resignation.

## IV.

As plaintiff has established that he suffered an adverse employment action, it is now necessary to address the central question presented in this case; namely whether the FBI's gender-normed PFT violates Title VII by requiring male NATs to perform 30 push-ups, while requiring female NATs to perform only 14. Plaintiff, who has the burden to demonstrate that the PFT is discriminatory,[18] claims this disparity is plainly facially discriminatory. Defendant argues that the PFT is not discriminatory because it is undeniable that, on average, there are physiological differences between men and women, and the gender-normed PFT standards simply reflect these differences to ensure that males and females are treated equally. Defendant's

---

[18] *See Gerner*, 674 F.3d at 266.

argument is not without a measure of intuitive appeal and common sense. Yet, this question cannot be resolved solely on the basis of intuition and common sense; rather, the question's resolution requires the interpretation and construction of the governing statutory provisions—§ 2000e–2(a)(1) and § 2000e–2(*l*)—in light of and in accord with the pertinent Supreme Court and circuit authority. Plaintiff claims the PFT violates both of these provisions, and hence each is separately addressed.

## A. § 2000e-2(a)(1)

The starting point of the analysis must be the language of the statute,[19] which provides, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Unless Congress indicates otherwise, statutory terms are given "their ordinary, contemporary, common meaning." *United States v. Powell*, 680 F.3d 350, 355 (4th Cir. 2012). The infinitive "to discriminate," when used as an intransitive verb, means "to make distinctions on the basis of a class or category without regard to individual merit." *The American Heritage Dictionary*. Thus, as this and other dictionary definitions[20] make clear, the plain meaning of "to

---

[19] *See Othi v. Holder*, 734 F.3d 259, 265 (4th Cir. 2013) ("We begin, as always in deciding questions of statutory interpretation, with the text of the statute."); *United States v. Ashford*, 718 F.3d 377, 382 (4th Cir. 2013) (quoting *Chesapeake Ranch Water Co. v. Bd. of Comm'rs of Calvert Cnty.*, 401 F.3d 274, 279 (4th Cir. 2005) ("As in all cases of statutory interpretation, our inquiry begins with the text of the statute.")).

[20] *See, e.g., Cambridge Dictionary* ("to treat a person or particular group of people differently and esp. unfairly, in a way that is worse than the way people are usually treated"); *Collins American Dictionary* ("to make distinctions in treatment"); *Dictionary.com* ("to make a distinction in favor of or against a person or thing on the basis of the group, class, or category to which the person or thing belongs rather than according to actual merit"); *Merriam-Webster Dictionary* ("to make a difference in treatment or favor on a basis other than individual merit"); *Oxford English Dictionary* ("[t]o treat a person or group in an unjust or prejudicial manner, esp. on the grounds of race, gender, sexual orientation, etc."). In addition, *Black's Law Dictionary* (9th ed. 2009) defines the noun "discrimination" as "differential treatment."

discriminate . . . because of [an] individual's . . . sex" in § 2000e-2(a)(1) is to treat an individual differently on the basis of sex. It follows that this provision's plain language captures and makes unlawful the PFT's differential treatment of men and women based on their sex. Nor is there any statutory exception for average, innate physiological differences between the sexes. Congress was clearly aware of any such average physiological differences, but chose to make no reference to, or accommodation for, them in § 2000e-2(a)(1). Nor do the plain words of the statute authorize discriminating against an individual on the basis of sex if that discrimination results in equal burdens on the sexes. In short, § 2000e-2(a)(1)'s plain language reaches and captures the PFT's differential treatment based on sex regardless of the average physiological differences between men and women and regardless of whether the burden placed on the sexes is equal.

The scant relevant Supreme Court authority on this issue supports this conclusion. Although no Supreme Court decision considers the precise question whether gender-normed physical fitness tests violate Title VII, two analogous cases lend substantial support to the result reached here. Most pertinent is *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1978), where a majority of the Supreme Court held that a city violated Title VII's prohibition on sex discrimination by requiring females to pay more into pension funds simply because females, on average, live longer than males.[21] In reaching this result, the Supreme Court acknowledged that it is true that women, on average, live longer than men. Yet importantly, the Court did not accept this as a justification for the city's differential treatment of male and female employees with respect to payments to a pension fund. In other words, disparate treatment discrimination may exist even if, as in *Manhart*, it is based on a "generalization that [is]

---

[21] The pertinent portion of the *Manhart* opinion—Part I—was authored by Justice Stevens and joined by (i) Justice Stewart, (ii) Justice White, (iii) Justice Marshall, and (iv) Justice Powell. Chief Justice Burger, Justice Blackmun, and Justice Rehnquist dissented to Part I. Justice Brennan took no part in the consideration or decision of the case.

unquestionably true." *Id.* at 707. Similarly, in *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187 (1991), the Supreme Court held that, even though child-bearing capacity is a real physiological difference that exists between men and women, a policy barring female employees capable of bearing children from jobs with a risk of lead exposure was plainly facially discriminatory under Title VII because it "create[d] a facial classification based on gender." 499 U.S. at 197. In so holding, the *Johnson Controls* Court adhered to the principle announced in *Manhart* that Title VII's "focus on the individual is unambiguous," and as such, "[i]t precludes treatment of individuals as simply components of a . . . sexual . . . class." *Manhart*, 435 U.S. at 708. Significantly, the majority in *Manhart* reached this result by applying a "simple test" that makes discrimination turn on "whether the evidence shows treatment of a person in a manner which but for that person's sex would be different." 435 U.S. at 711 (internal quotations omitted). Measured by this test, the PFT clearly falls within § 2000e-2(a)(1)'s prohibition against discrimination on the basis of sex: plaintiff was treated in a manner which but for his sex would have been different.

Nor is this conclusion altered by the fact that defendant, in imposing the PFT, did not intend to favor or exclude one sex over the other. This is so because plaintiff has alleged disparate treatment, which does not require any evidence of animus or discriminatory motive; rather "[w]hether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination." *Johnson Controls, Inc.*, 499 U.S. at 199. In sum, the plain language of § 2000e-2(a)(1) clearly warrants the conclusion that the PFT is discriminatory treatment based on sex, and this conclusion finds firm support in the pertinent Supreme Court authority.

.

Defendant's cited authority does not point persuasively to a contrary conclusion. The

Supreme Court's decision in *United States v. Virginia*, 518 U.S. 515 (1996) [hereinafter *VMI*],

on which defendant heavily relies, is not a Title VII case; it is an Equal Protection Clause case in

which the Court majority ordered the Virginia Military Institute to admit women. As such, *VMI*

does not contradict the conclusion reached here. Still, defendant points to a single footnote of

dicta in *VMI* in which the Court majority contemplated that "[a]dmitting women to VMI would

undoubtedly require alterations necessary to afford members of each sex privacy from the other

sex in living arrangements, and to adjust aspects of the physical training programs." 518 U.S. at

551 n.19. This footnote, an aside in a non-Title VII case, has no bearing on the definition of sex

discrimination under Title VII and cannot fairly be said to sanction the use of gender-normed

physical fitness tests under Title VII.[22]

Defendant also relies on various lower court decisions addressing grooming and

maximum weight standards that treat males and females differently. These lower court cases,[23]

---

[22] It is worth noting that Title VII does not apply to the factual scenario presented in *VMI* because Title VII prohibits discrimination by employers, employment agencies, and labor organizations, but does not apply to the admission of students at universities. *See* 42 U.S.C. § 2000e-2(a)-(c). It is also worth noting that uniformed members of the nation's armed forces are likewise not covered by Title VII. *Randall v. United States*, 95 F.3d 339, 343 (4th Cir. 1996) ("[E]very federal court of appeal that has addressed the issue has held that Title VII does not apply to uniformed members of the military.").

[23] *See, e.g., Jespersen v. Harrah's Operating Co., Inc.*, 444 F.3d 1104 (9th Cir. 2006) (en banc) (holding that requirement that only female employees wear makeup was not Title VII sex discrimination because plaintiff failed to create a record that the policy was more burdensome for women than men); *Frank v. United Airlines, Inc.*, 216 F.3d 845, 854 (9th Cir. 2000) (holding that airline maximum weight requirements violated Title VII because "[o]n its face, United's weight policy 'applie[d] less favorably to one gender'") (internal citations omitted); *Gerdom v. Cont'l Airlines, Inc.*, 692 F.2d 602, 606 (9th Cir. 1982) (holding that airline's policy of applying weight requirement to the all-female job classification "flight hostesses" imposed a greater burden on females and was thus facially discriminatory under Title VII); *Earwood v. Cont'l Se. Lines, Inc.*, 539 F.2d 1349 (4th Cir. 1976) (holding that bus company's requirement that male employees keep short hair did not violate Title VII because hair length is not an immutable characteristic);

many from the Ninth Circuit, but including two from the Fourth Circuit (*Earwood*, 539 F.2d 1349, and *Jarrell*, 577 F.2d 869), held that different requirements for males and females in the context of maximum weight and personal grooming standards may be permissible under Title VII "where the requirements impose[] no greater burden on one sex than on the other." *Gerdom v. Cont'l Airlines, Inc.*, 692 F.2d 602, 605 (9th Cir. 1982) (holding that under the "no greater burden" test, airline's policy of applying weight requirement to the all-female job classification "flight hostesses" imposed a greater burden on females and was thus facially discriminatory under Title VII). Defendant's argument that the *Gerdom* "no greater burden" test should be applied to gender-normed physical fitness standards is unpersuasive for several reasons. First, this line of cases is contradicted by the plain language of § 2000e-2(a)(1), which makes it unlawful "to discriminate against any individual . . . because of such individual's . . . sex." This language makes no accommodation for average physiological differences between the sexes, and does not authorize discriminatory treatment where that treatment results in equal burdens on the sexes. Second, the *Gerdom* line of maximum weight and grooming standard cases contravenes the "simple test" announced in *Manhart* under which discrimination exists when an individual is treated "in a manner which but for that person's sex would be different," even if that differential treatment is rooted in a "generalization that [is] unquestionably true." 435 U.S. at 707, 711. Finally, the passage of § 2000e–2(*l*), discussed *infra*, as part of the Civil Rights Act of 1991 renders the *Gerdom* line of maximum weight and grooming standard cases inapposite to physical fitness tests as physical fitness tests are more appropriately analyzed under § 2000e–2(*l*), which

---

*Jarrell v. E. Airlines, Inc.*, 430 F. Supp. 884 (E.D. Va. 1977), *aff'd sub nom. Jarrell v. E. Airlines, Inc.*, 577 F.2d 869 (4th Cir. 1978) (per curiam) (holding that flight attendant weight control program was not discriminatory under Title VII because "there is nothing inherent in womanhood which makes Eastern's weight standards more difficult for women to satisfy than men").

applies specifically to the use of differential standards in employment related tests. In summary, the *Gerdom* "no greater burden" test and other cases applying the standard cannot apply here to displace (i) the plain language of § 2000e-2(a)(1), (ii) the Supreme Court's clear directives in *Manhart* and *Johnson Controls*, and (iii) Congress's enactment of § 2000e-2(*l*) as part of the Civil Rights Act of 1991.[24]

Also unpersuasive are the four cases that defendant cites that specifically address the effect of gender-normed fitness standards on males. None is either controlling in this circuit or persuasive in its reasoning. In *Powell v Reno*, No. 96-2743, 1997 U.S. Dist. LEXIS 24169 (D. D.C. July 24, 1997), an unpublished case in which the U.S. District Court for the District of Columbia held that the FBI's PFT for NATs was not facially discriminatory against males under § 2000e-2(a)(1), the court failed to cite any authority directly supporting the conclusion that gender-normed physical fitness test standards are nondiscriminatory under Title VII and provided virtually no reasoning or analysis.[25] Similarly unpersuasive is *Hale v. Holder*, EEOC Decision No. 570-2007-00423X (Sept. 20, 2010), in which an administrative law judge concluded that the FBI's gender-normed PFT did not constitute disparate treatment toward males

---

[24] Neither reached nor addressed here is whether the *Gerdom* "no greater burden" test might operate, in certain circumstances, in the context of a BFOQ defense.

[25] In support of its Title VII holding, the *Powell* court cited a total of five cases, none of which is on point: (1) *VMI*, 518 U.S. 515, an Equal Protection Clause case with a single footnote on the possibility of adjusting physical training programs for females; (2) *Michael M. v. Superior Court of Sonoma Cnty.*, 450 U.S. 464 (1981), which upheld a statutory rape law that specifically criminalized men having sex with minor females; (3) *Evans v. City of Evanston*, 941 F.2d 473 (7th Cir. 1991), in which the Seventh Circuit reviewed an issue of attorney's fees but did not reach or decide the underlying disparate treatment issue decided by the district court; (4) *Gerdom*, 692 F.2d 602, a Ninth Circuit airline maximum weight standard case, and (5) *United States v. City of Wichita Falls*, 704 F. Supp. 709 (N.D. Tex. 1988), a pre-1991 district court case finding that un-validated gender-normed physical tests did not violate a Title VII consent decree because the test was necessary to the job of a police officer. In addition, the *Powell* court failed to mention the then recently-enacted § 2000e-2(*l*), which, as here, was pertinent and might well have affected the result reached there.

under Title VII. There, the sole on-point federal case relied on was *Powell*. The *Hale* opinion also relies, without analysis, on *VMI* and the maximum weight and grooming standard cases. Defendant's reliance on two state court decisions is similarly unavailing. In *In re Scott*, 779 A.2d 655 (Vt. 2001), an appeal from the Vermont Labor Relations Board under Title VII's disparate treatment provision, the Supreme Court of Vermont conflated the disparate treatment and disparate impact standards, and then erroneously applied the disparate impact standard to conclude that there was no disparate *treatment* in requiring males to complete a 1.5-mile run in a shorter amount of time than females because the time requirements had no disparate *impact* on males. 779 A.2d at 660-61. Similarly, in *Alspaugh v. Comm'n on Law Enforcement Standards*, 634 N.W.2d 161 (Mich. App. 2001), in which male candidates who did not pass a gender-normed fitness test to qualify for the police academy brought a discrimination claim under the Michigan Constitution and Michigan's antidiscrimination statute, the Court of Appeals of Michigan applied an equal protection analysis to conclude that gender norming to avoid a disparate impact on female job applicants is significantly related to an important government interest. 634 N.W.2d at 169. Thus, the four cases that defendant argues are factually analogous to this case and thus controlling are not only not binding in this circuit, but each lacks persuasive legal reasoning and fails to cite any persuasive authority.

The result reached here is not meant to imply that gender-normed fitness tests are *per se* illegal under Title VII. Indeed, to require that all physical fitness tests use a single standard for both males and females would likely give rise to Title VII violations in the form of physical fitness tests that have an impermissible disparate impact on females.[26] Rather, the decision

---

[26] *See, e.g., Lanning v. Se. Pennsylvania Transp. Auth. (SEPTA)*, 181 F.3d 478 (3d Cir. 1999) (holding that requiring all transit officer applicants to complete a 1.5-mile run in 12 minutes had a disparate impact on women); *Easterling v. State of Connecticut*, 783 F. Supp. 2d 323 (D. Conn.

reached here is that gender-normed physical fitness tests are not, as some courts have assumed, *per se legal* based solely on the general assertion that there are real physiological differences between males and females. It cannot be the case that because there are real physiological differences between the sexes, *all* gender-normed fitness tests are permissible under Title VII. Nor is the converse true: all gender-normed physical fitness tests are not *per se* impermissible under Title VII. Rather, whether a particular gender-normed physical fitness test is legal and establishes appropriate standards must be analyzed under a more rigorous and exacting legal standard. And indeed, Congress recognized this need for a more rigorous and exacting legal standard in this context when it enacted § 2000e-2(*l*) as part of the Civil Rights Act of 1991, to which this analysis now turns.

### B.  § 2000e–2(*l*)

Plaintiff argues that the PFT violates not only § 2000e-2(a)(1)'s plain prohibition on treating males and females differently, but also § 2000e–2(*l*), enacted as part of the Civil Rights Act of 1991. This statute provides in pertinent part that:

> It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to . . . use different cutoff scores for . . . employment related tests on the basis of . . . sex.

42 U.S.C. § 2000e–2(*l*). No court has thus far addressed the question whether § 2000e–2(*l*) applies to using different cutoff scores for males and females in physical fitness tests. It must therefore be determined whether the FBI's PFT falls under the purview of § 2000e–2(*l*) as a matter of statutory interpretation. More specifically, the question presented is whether the

---

2011) (finding a gender-normed physical fitness test violated Title VII where there was evidence that women had a lower passage rate than men); *Wichita Falls*, 704 F. Supp. 709 (finding that a gender-normed physical test did not violate a Title VII consent decree because the test was necessary to the job of a police officer).

statutory phrase "employment related tests" encompasses gender-normed physical fitness tests required by employers.

Questions of statutory interpretation necessarily begin (and may very well end) with the text of the statute,[27] and unless Congress indicates otherwise, statutory terms are given "their ordinary, contemporary, common meaning." *Powell*, 680 F.3d at 355. The ordinary, contemporary, common meaning of "employment related tests" fits the FBI PFT like the proverbial glove. It is a test that applicants are required to pass in order to gain employment as FBI Special Agents. Thus, it is an employment related test. It is hard to see any warrant for concluding otherwise. Congress could have excluded physical fitness tests from § 2000e–2(*l*) had it wished to do so; it did not do so. Accordingly, the plain language of § 2000e–2(*l*) makes clear that it applies to gender-normed physical fitness tests.[28]

This plain language interpretation is also consistent with the limited existing jurisprudence on § 2000e–2(*l*), which has thus far focused on instances in which employers set different employment test cut-off scores for different racial groups to avoid any unintentional disparate impact on minority applicants. Most notably, in *Ricci v. DeStefano*, 557 U.S. 557 (2009), the Supreme Court held that the New Haven Fire Department's decision to discard the

---

[27] *See supra* note 19.

[28] The legislative history of the Civil Rights Act of 1991, which was enacted to codify the prohibition on disparate impact discrimination, also supports this conclusion. The original 1990 version of the Act was vetoed by President George H.W. Bush, largely out of a concern that "employers [would] be driven to adopt quotas in order to avoid [disparate impact] liability." S. Doc. No. 101-35, at 2 (1990). The vetoed 1990 bill lacked any provision prohibiting employers from engaging in group norming in employment testing—*i.e.*, comparing women against women, whites against whites, and blacks against blacks to minimize the risk of disparate impact liability. *See* Civil Rights Act of 1990, S. 2104, 101st Cong. (1990). Section 2000e–2(*l*) was added to the 1991 version of the bill that was ultimately enacted in order to make clear that the Act prohibits the type of group norming at issue here unless a BFOQ exists to justify such group norming.

- 24 -

results of a promotion test—a combination written and oral examination—because white candidates had scored higher than minority candidates violated Title VII as "race-based action like the City's in this case is impermissible under Title VII unless the employer can demonstrate a strong basis in evidence that, had it not taken the action, it would have been liable under the disparate-impact statute." 557 U.S. at 563. And, in *Dean v. City of Shreveport*, 438 F.3d 448 (5th Cir. 2006), the only circuit court decision directly addressing the applicability of 2000e-2(*l*) to differential cut-off scores based on sex, the Fifth Circuit held that an employment test "violate[d] the plain language of section 2000e-2(*l*) because it ha[d] the practical effect of requiring different cutoff scores, based solely on race and *sex*, for continuing further in the hiring process." 438 F.3d at 463 (emphasis added). Thus, despite defendant's arguments to the contrary, the existing case law compels the conclusion that § 2000e–2(*l*) applies not only to race norming, but also to gender norming, and that an employer may only engage in such gender norming to avoid a disparate impact on females where "there is a strong basis in evidence of disparate-impact liability."[29] *Ricci*, 557 U.S. at 583. Here, defendant has made no attempt to demonstrate a strong basis in evidence of disparate impact liability, as it contends that neither § 2000e–2(*l*) nor *Ricci* apply.[30]

Although in this case the possibility of a disparate impact on females does not justify defendant's facially discriminatory policy, it is important to recognize that physical fitness tests holding males and females to a singular standard could well have a disparate impact on

---

[29] Or, of course, unless there is a valid BFOQ, discussed *infra*.

[30] Nor could defendant demonstrate a strong basis in evidence of disparate impact liability on the existing record. Notably, the Supreme Court in *Ricci* found that a promotion test completed by 118 candidates (68 white, 27 black, and 23 Hispanic) that would have resulted in the immediate promotion of 17 white candidates, 2 Hispanic candidates, and no black candidates, was "far from a strong basis in evidence that the City would have been liable [for disparate impact liability] under Title VII." 557 U.S. at 566, 587. No such evidence exists here.

females,[31] and hence § 2000e–2(*l*) is not a blanket prohibition on the use of gender-normed standards in physical fitness tests. Indeed, in *VMI* the Supreme Court hinted that in some instances, "minimum essential adjustments"[32] in physical fitness standards may be appropriate "because of physiological differences between male and female individuals."[33] There must, therefore, be a mechanism through which it is possible to reconcile (i) the Supreme Court's clear holding that Title VII prohibits treating employees differently based on their sex with (ii) the risk that physical fitness tests that apply a single standard to both males and females may have a disparate impact on females. A sensible way to reconcile these considerations is through the application of the BFOQ defense.

## V.

Analysis of plaintiff's disparate treatment claim does not end with the conclusion that the PFT is facially discriminatory under § 2000e–2(a)(1) and § 2000e–2(*l*). It remains to consider whether the PFT might nonetheless be justified under the BFOQ defense.[34] It is well-settled that under the BFOQ defense, an employer may use an explicit sex-based policy where "sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e–2(e); *see also Johnson Controls*, 499 U.S.

---

[31] *See supra* note 26.

[32] *VMI*, 518 U.S. at 551 n.19. As noted *supra*, *VMI*, an Equal Protection Clause case, is not authoritative here, as it is not a Title VII case and does not address this issue in depth or in its holding. Yet the case is notable in that it indicates that the Supreme Court contemplated, in dicta, that differential standards to reflect physiological differences between males and females may, in some instances, be appropriate.

[33] *Id.*

[34] Defendant argues, incorrectly, that this issue need not be reached because plaintiff has failed to prove a *prima facie* case of Title VII discrimination. For the reasons already stated, plaintiff has indeed established a *prima facie* case of discrimination under both § 2000e–2(a)(1) and § 2000e–2(*l*).

at 200 ("[A]n explicit gender-based policy is sex discrimination . . . and thus may be defended

only as a BFOQ."); *United States v. Gregory*, 818 F.2d 1114, 1117 (4th Cir. 1987). The burden is

on the defendant employer to show that a given policy is a valid BFOQ. *Johnson Controls*, 499

U.S. at 222.

The BFOQ defense has typically been applied in cases where either males or females

were, as a group, excluded from a particular position of employment. For example, in *Dothard v.*

*Rawlinson*, 433 U.S. 321 (1977), the Supreme Court held that an Alabama state penitentiary

regulation that had the effect of excluding a large proportion of women[35] from consideration for

approximately 75% of the available correctional counselor jobs in the Alabama prison system

was a valid BFOQ due to public safety concerns in contact areas of maximum-security male

penitentiaries. 433 U.S. at 336. By contrast, the Supreme Court in *Johnson Controls* held that a

fetal protection policy prohibiting all women capable of bearing children from holding positions

manufacturing batteries due to the potential danger to pregnant employees' fetuses was not a

valid BFOQ because there was no interference "with the employee's ability to perform the

job."[36] 499 U.S. at 204. The key difference between these cases is that in *Dothard* there was a

legitimate job-related rationale for precluding women, as a class, from holding certain positions

while in *Johnson Controls* there was no such job-related rationale. Although *Dothard* and

*Johnson Controls* involved policies that excluded females, as a class, from certain positions,

there is no reason in the statutory text or purpose to limit the scope of the BFOQ defense to

situations that exclude all males or all females from a given position. Rather, the plain statutory

---

[35] The correctional counselor positions at issue in *Dothard* had minimum height and weight requirements that resulted in the exclusion of a large number of women from consideration. 433 U.S. at 327.

[36] The Supreme Court did not address whether a policy prohibiting only pregnant women from battery-manufacturing positions would be permissible.

language clearly encompasses, as here, the application of differential standards to males and females. Specifically, the statute embodying the BFOQ defense provides as follows:

> [I]t shall not be an unlawful employment practice for an employer to hire and employ employees . . . on the basis of his . . . sex . . . in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise[.]

42 U.S.C. § 2000e-2(e). The phrase "on the basis of . . . sex" clearly encompasses a wider range of situations than the outright exclusion of all males or all females from an employment position, and clearly includes any instance in which an employment practice passes the "simple test of whether the evidence shows treatment of a person in a manner which but for that person's sex would be different." *Manhart*, 435 U.S. at 711. Thus, to justify the PFT's facially discriminatory treatment of men and women, defendant must establish that using different minimum physical fitness standards for males and females is a valid BFOQ.

This is not easily established. A successful BFOQ defense requires that "a job qualification . . . relate to the essence, or to the central mission of the employer's business." *Johnson Controls*, 499 U.S. at 203 (internal quotations omitted). And courts have made clear that the defense should be read narrowly. *Id.* at 201 ("The BFOQ defense is written narrowly, and this Court has read it narrowly."). In *Johnson Controls*, the Court made clear that two primary requirements must be met for a given policy to be considered a BFOQ: (i) a policy must be "an objective, verifiable requirement" that (ii) "concern[s] job-related skills and aptitudes." *Id.* Thus, given that the PFT is discriminatory in that it treats men and women differently on the basis of their sex, it may only be legally justified as a BFOQ if it is (i) an objective, verifiable test that measures (ii) "*job-related* skills and aptitudes." *Id.* (emphasis added).

In the instant case, defendant has proffered sufficient evidence on the development of the PFT to demonstrate that that the test provides an objective, verifiable measure of physical fitness.

In support of the PFT methodology, defendant submitted the 2003 Grubb Report[37] and the 2005 Grubb Report,[38] which set forth the methodology used to develop the PFT. Specifically, based on the Essential Task List for Special Agents and fitness industry standards, the FBI determined that the PFT would consist of a battery of four tests to "measure overall fitness required for safety in terms of core body strength (situps), speed/anaerobic capacity (sprint), arm strength (push ups) [sic], and endurance/aerobic capacity (1.5 mile run)." 2003 Grubb Report at 5. To determine the passing scores for the PFT, in 2003 the FBI conducted a pilot study by administering the four-test battery to seven classes of NATs—260 males and 64 females—during their first week of the NATP. *Id.* at 6. The means and standard deviations for males and females in the sample population were calculated, and the minimum passing score for each sex in each event was set at one standard deviation below the mean number or time of the pilot group. *Id.* at 7, 9. Thereafter, in 2005 the FBI conducted a follow-up study in which it compared PFT test scores from the 2003 pilot study with the scores of six 2004 classes of NATs, the results of which were largely consistent with the results of the pilot study. 2005 Grubb Report at 20. The 2003 and 2005 Grubb Reports clearly demonstrate that the FBI PFT is an objective, verifiable measure; it was developed and tested using valid statistical methodology, which is well-documented in the reports. This is not a "general subjective standard[]" of the type that *Johnson Controls* deems impermissible. *See Johnson Controls*, 499 U.S. at 201 (stating that the language of the BFOQ statute "prevents the use of general subjective standards").

Although defendant has successfully demonstrated that the PFT provides an objective, verifiable measure of physical fitness, defendant has failed to meet the second BFOQ

---

[37] *See supra* note 5.

[38] *See supra* note 6.

requirement—that the PFT is properly focused on "job-related skills and aptitudes." *Id.* As the Supreme Court, interpreting the BFOQ defense, has made clear, "Congress narrowed the term [qualifications] to qualifications that affect an employee's ability to do the job." *Id.* Plaintiff's argument in this regard, distilled to its essence, is that because the FBI specifically designed each component of the PFT to measure a NAT's ability to perform discrete tasks—*i.e.* the push-up test measures the upper body strength required for tasks such as lifting and pushing, and the 1.5-mile run measures the aerobic capacity and endurance required for sustained pursuit of a subject or struggling with a resistant subject for a long period of time[39]—the PFT should apply a gender-neutral standard and should focus on actual job tasks, such as carrying objects weighing a certain number of pounds for a certain period of time. This type of test is referred to as a job-task simulation test ("JTST").[40] In response, defendant argues that a JTST is not appropriate because the PFT is designed to measure "an overall level of fitness" rather than the ability to perform specific tasks required of FBI Special Agents. 2003 Grubb Report at 14. Yet, fatal to defendant's argument is its failure to link the PFT to any "qualifications that affect an employee's ability to do the job." 499 U.S. at 201.

Defendant provides two inconsistent justifications for implementing the PFT as designed. Specifically, defendant argues at some points that the PFT is designed to measure the skills required to succeed as an FBI Special Agent, stating, for example, that "[t]he FBI chose a four-event test battery as each event is related to the underlying fitness components needed to carry

---

[39] 2003 Grubb Report at 6.

[40] Collingwood Report, Def.'s Summ. J. Br. Ex. B, at 2-3. Dr. Thomas Collingwood is an exercise physiologist retained by plaintiff as an expert witness.

out essential tasks of the [Special Agent] position." Greathouse Decl. ¶ 11.[41] Defendant also asserts that "those who are physically fit tend to be more productive, use less sick leave, and are better able to handle stressful situations." *Id.* ¶ 8. Yet, significantly, defendant fatally undermines this stated justification by conceding that the FBI never tests Special Agents for physical fitness after they graduate from the NATP, while at the same time acknowledging that "[i]n order to be considered physically fit, one must engage in regular physical activity." *Id.* If physical fitness is indeed essential to performing the tasks required of a Special Agent, it makes no sense that the FBI has no policy requiring that Special Agents maintain a particular level of fitness once they are actually on the job. Indeed, the 2003 Grubb Report acknowledged this, stating that "implementation of a fitness assessment for on-board agents should be considered (with age-appropriate norms) to ensure continued safe performance in the Special Agent position, as well as to increase the defensibility of any personnel actions taken at the applicant or NAT phase of selection." 2003 Grubb Report at 2. Defendant, however, failed to heed its own advice. Thus, because the FBI maintains no minimum physical fitness requirements for incumbent Special Agents, defendant cannot persuasively argue that physical fitness "relate[s] to the essence, or to the central mission of the [FBI]'s business." *Johnson Controls*, 499 U.S. at 203 (internal quotations omitted).

Presumably realizing this logical inconsistency, defendant argues alternatively that the rationale supporting the PFT is safety during training. In this respect, defendant asserts that "[FBI] management determined that a mandatory physical fitness test was needed to ensure that NATs *arrived* at the FBI Academy physically prepared for training" because "NATs that *enter* the NATP physically prepared are less likely to incur an injury requiring them to miss valuable

---

[41] Def.'s Summ. J. Br. Attach. 1 [hereinafter Greathouse Decl.].

training time, and they also tend to perform well during physically strenuous training events."
Greathouse Decl. ¶¶ 10, 13 (emphasis added). Yet, this asserted justification is also inconsistent
with the manner in which the FBI chose to implement the PFT and with the factual record in this
case. Specifically, the PFT functions as an NATP graduation requirement rather than as an
NATP admission requirement. In other words, as here, NATs may be permitted to complete the
NATP without having passed the PFT, but then prevented from graduating due to failure to pass
the PFT at the conclusion of the NATP. Indeed, plaintiff passed the PFT at the Milwaukee Field
Office prior to commencing the NATP and then completed the NATP without injury before he
was prevented from graduating after he failed the PFT in week 22 of training. Hence, according
to defendant's assertion that the PFT is designed so that NATs *arrive* at the NATP prepared and
complete the NATP without injury, plaintiff should have been permitted to graduate. Therefore,
because defendant has not implemented the PFT in a manner consistent with either of its
proffered justifications, defendant has failed to meet its burden to demonstrate that the PFT
measures "qualifications that affect an employee's ability to do the job"[42] as is required to
establish a valid BFOQ defense.

The decision reached here is not intended to make a broad statement on the use of
gender-normed physical fitness tests generally or on their applicability to the field of law
enforcement. It is obvious that law enforcement positions, such as that of an FBI Special Agent,
include physical demands, and thus some types of physical tests may be closely related to a
person's ability to perform the various duties of an FBI Special Agent. Gender-normed physical
fitness tests present a challenge to Title VII jurisprudence because where, as here, female law
enforcement officials perform the same physical job tasks as their male counterparts, gender-

---

[42] *Johnson Controls*, 499 U.S. at 201.

normed physical fitness standards cannot logically be used to measure an applicant's ability to perform *discrete tasks*, such as restraining or chasing a subject. This is so because if both males and females are expected to perform these tasks at the same level of performance, then testing males and females according to different standards cannot be an objective measure of ability to perform those tasks. On the other hand, because real physiological differences exist, on average, between males and females, gender norming may in some instances be appropriate for tests designed to measure *overall physical fitness* rather than the ability to perform specific discrete tasks.

Yet, the fact that gender norming may be appropriate in some instances does not render it permissible in all instances. This decision does not deem tests of overall physical fitness impermissible under Title VII, nor does it conclude that the use of gender-normed standards for such tests of overall physical fitness is always inappropriate. Rather, this decision holds only that in the particular factual circumstances of this case, given the evidence that defendant has entered in the record, defendant has failed to establish that its PFT is an adequate measure of job-related skills and aptitudes, and thus defendant cannot legally justify its facially discriminatory PFT as a valid BFOQ under existing Title VII law.[43]

## VI.

The result reached here is not reached easily or eagerly. It is undeniable that men and women, as distinct groups, have physiological differences. Under current law, however, these obvious physiological differences cannot support the differential treatment reflected in the FBI's gender-normed PFT absent a valid BFOQ, which is lacking here. Given this, the summary

---

[43] It is important to note that neither addressed nor decided here is whether a gender-normed physical fitness test administered to NATs upon arrival at the NATP would pass BFOQ muster. Also not addressed or decided is whether a gender- and age-normed PFT administered to Special Agents throughout their careers would pass BFOQ muster.

judgment record reflects that plaintiff has met his burden to demonstrate that there is "no genuine issue as to any material fact" and that he is "entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. Accordingly, plaintiff's motion for summary judgment must be granted, and defendant's motion for summary judgment must be denied. The issue of an appropriate remedy has yet to be resolved.

An appropriate Order will issue.


Alexandria, Virginia
June 10, 2014


T. S. Ellis, III
United States District Judge