**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| JAY J. BAUER, </br>     Plaintiff, </br> </br>     v. </br> </br> JEFFERSON B. SESSIONS, III, </br>     Defendant. | ) </br> ) </br> ) </br> )     Case No. 1:13-cv-93 </br> ) </br> ) </br> ) |

**MEMORANDUM OPINION**

At issue on remand in this sex discrimination case are the parties' cross motions for summary judgment. The dispositive question is whether the gender-normed physical fitness test ("PFT") implemented by the Federal Bureau of Investigation for new agent trainees ("NATs") constituted unlawful disparate treatment on the basis of sex[1] by imposing a significantly greater burden of compliance on men than on women. In other words, the question is whether the FBI's gender-normed fitness standards required men and women to demonstrate the same level of physical fitness.

Plaintiff, an aspiring FBI special agent, failed during his training to perform the 30 pushups required of male NATs. Thereafter, on April 2, 2012, plaintiff filed suit in the United States District Court for the Northern District of Illinois against the Attorney General of the United States.[2] The complaint alleges that the 30-pushup requirement constitutes unlawful sex discrimination against men because female NATs need only complete 14 pushups. Thus, plaintiff

---

[1] This Memorandum Opinion, consistent with circuit precedent, proceeds by treating the terms, sex and gender, as fungible. *See Bauer v. Lynch*, 812 F.3d 340, 347 n.9 (4th Cir. 2016).

[2] Because plaintiff filed this matter in 2012, several persons have been substituted as defendant, pursuant to Rule 25(d), Fed. R. Civ. P. The current Attorney General and defendant in this matter is Jefferson Sessions, III.

brought claims under two provisions of Title VII, namely, 42 U.S.C. § 2000e-2(a)(1),[3] which generally prohibits employment discrimination by private employers, and 42 U.S.C. § 2000e-2(*l*), which specifically prohibits employers from using discriminatory standards on employment-related tests. In response to plaintiff's allegations, defendant argued that the FBI's gender-normed standards are not discriminatory because they require the same fitness level of all NATs, as evidenced by the fact that men and women pass the PFT, including the pushup requirement, at the same rate. The matter was subsequently transferred to this district, and in November 2013 the parties filed cross motions for summary judgment.

After extensive briefing and argument, a memorandum opinion and order issued on June 10, 2014, granting plaintiff's summary judgment motion and denying defendant's. The opinion noted that although "it is undeniable that men and women, as distinct groups, have physiological differences," and that gender-normed standards may sometimes be appropriate or necessary, "physiological differences cannot support the differential treatment reflected in the FBI's PFT absent a valid [bona fide occupational qualification], which is lacking here." *Bauer v. Holder*, 25 F. Supp. 3d 842, 865 (E.D. Va. 2014) ("*Bauer I*"). That opinion relied on the Supreme Court's "simple test" espoused in *City of Los Angeles, Department of Water & Power v. Manhart*, 435 U.S. 702 (1978). The "simple test" recognizes unlawful sex discrimination where "the evidence shows treatment of a person in a manner which but for that person's sex would be different." *Manhart*, 435 U.S. at 711 (quotation marks omitted). On appeal, the Fourth Circuit reversed and remanded. *See Bauer v. Lynch*, 812 F.3d 340 (4th Cir. 2016) ("*Bauer II*"). Recognizing that this

---

[3] As the Fourth Circuit noted on appeal, the complaint incorrectly invoked § 2000e-2(a)(1), which addresses discrimination in the private sector. The correct provision here is § 2000e-16(a), which prohibits sex discrimination by federal employers. Yet, this mistake "is of no moment" because the Fourth Circuit "ha[s] treated §§ 2000e-2(a) and 2000e-16(a) as comparable, with the liability standards governing the former being applicable to the latter." 812 F.3d at 345 n.3.

case involves a "novel issue," the Fourth Circuit rejected *Manhart*'s "simple test" in this context and held that "an employer does not contravene Title VII when it utilizes physical fitness standards that distinguish between the sexes on the basis of their physiological differences but impose an equal burden of compliance on both men and women, requiring the same level of physical fitness of each." *Id.* at 347, 351.

Plaintiff subsequently sought a writ of *certiorari*, but that petition was denied. *See* 137 S. Ct. 372 (2016). On remand, the parties once again filed cross motions for summary judgment. As the matter has been fully briefed and argued orally, it is now ripe for disposition.

**I.**

Most of the facts in this case are undisputed and have already been recounted in two published opinions. *See Bauer I*, 25 F. Supp. 3d at 845-50; *Bauer II*, 812 F.3d at 342-47. The following are the undisputed material facts pertinent to the parties' current summary judgment motions.

In short, plaintiff, now an FBI intelligence analyst, originally sought employment with the Bureau as a special agent. In 2009, plaintiff successfully became a NAT at the FBI Academy in Quantico, Virginia. The FBI, in training the recruits, required all NATs to show proficiency in four categories: (1) academics, (2) firearms training, (3) practical applications/skills training, and (4) physical/defensive tactics training. Moreover, the Academy distributed to all NATs a document titled "Rules, Regulations and Requirements at the FBI Academy for New Agent Trainees," which included the requirements and standards for each of these four categories and provided that failure to demonstrate proficiency in any one of the four categories could result in a NAT's dismissal. Plaintiff's sex discrimination claim focuses on the last category, physical training.

The FBI's physical training program included, among other things, the PFT, which comprised four events: (1) one-minute sit-ups, (2) a 300 meter run, (3) a 1.5 mile-run, and (4) pushups to exhaustion. Specifically, the Bureau required all NATs to achieve a minimum cumulative score of twelve points with at least one point in each of the four events. Further, each PFT event was scored on a ten-point scale, for a maximum overall score of 40 points. A NAT received one point for achieving the minimum standard in an event, and three points for reaching the mean. Each standard was gender-normed. As relevant here, the FBI's gender-normed minimum standards required men to complete at least 30 pushups, but required women to complete only 14. During his 22-week training program at the Academy, plaintiff attempted the PFT on five occasions. He failed each time. In fact, on each attempt plaintiff scored over 12 cumulative points, but scored none in the pushup event—although he surpassed the minimum number required of women, plaintiff could not perform the 30 pushups required of men. On his fifth and final try, plaintiff missed the males' mark by a single pushup.[4]

With the exception of his failure to perform enough pushups, plaintiff's performance at the Academy seems to have been largely unassailable. After all, his fellow NATs elected him as their graduation speaker. Yet, plaintiff's inability to surpass the minimum pushup quota for men prevented him from obtaining a position as a special agent. Plaintiff then sued, alleging sex discrimination in light of the different pushup standards imposed on men and women.

Plaintiff, of course, was by no means the first NAT to take the PFT. Rather, the Bureau had implemented the PFT as a mandatory test for all NATs about five years prior, following a 2003 Pilot Study comprising 324 individuals—260 men and 64 women—who completed the

---

[4] Plaintiff has represented that this was not an intentional miss. It is also worth noting that FBI instructors counted NATs' pushups during the PFT, in accordance with a Bureau policy in place since 2005.

PFT during their first week at the FBI Academy.[5] The FBI, seeking to normalize its physical fitness standards to account for physiological differences between the sexes, used the 2003 Pilot Study to establish gender-specific minimum scores. Specifically, the FBI calculated the mean performance for each sex in the Pilot Study and then set the minimum passing scores for each PFT event at one standard deviation below those mean scores. For the pushup event, specifically, the FBI set the minimum score at approximately the $15.7^{th}$ percentile for males and at the $15.9^{th}$ percentile for females who had participated in the Pilot Study.[6] In other words, almost exactly 84% of men in the study had completed at least 30 pushups, and almost exactly 84% of the women had completed at least 14. Thus, the Bureau decided to make 30 and 14 pushups the minimum scores for male and female NATs, respectively. Furthermore, these differences in percentiles and pass rates between the sexes were not statistically significant, and in 2004 the Bureau adopted the PFT as a graduation requirement for NATs.

Thereafter, in 2005, the FBI performed a follow up study on the PFT and confirmed that male and female NATs passed the test at equivalent rates. In fact, in 2004, both males and females passed the PFT at higher rates than in previous years. Specifically, 90.2% of male NATs and 89.5% of female NATs had passed the PFT by week 7 of their training programs. This difference in pass rates between men and women was statistically insignificant. *See* 2005 Grubb

---

[5] The FBI's process in selecting the PFT events and minimum passing standards is chronicled in two reports authored by Amy D. Grubb, Ph.D., an FBI Industrial/Organizational Psychologist—a 2003 study titled "Validation of a Physical Training Test: Report of Standards, Findings, and Recommendations" ("2003 Grubb Report") and a 2005 study titled "The Physical Fitness Test: An Evaluation of the Standards and Report of Validation Evidence" ("2005 Grubb Report").

[6] Plaintiff correctly notes that 10 out of 236 men (4.24%), and 0 of 57 women (0%) failed the PFT at week 1 of the training program by failing to achieve the minimum score in one of the 4 events. Yet, there is no indication in the record that this total was statistically significant, and it has no bearing on the ultimate, undisputed conclusion the FBI set the minimum score at the $15.7^{th}$ percentile for males and at the $15.9^{th}$ percentile for females who had participated in the Pilot Study.

Report. Subsequent years and NAT classes have confirmed these data, too. Among the more than 6,000 NATs who have taken the PFT from 2004 to 2012, approximately 99% of both men and women passed. Once again, there is no statistically significant difference in the pass rates between the sexes.

As noted in *Bauer I*, it is undisputed that the 2005 Grubb Report looked at various alternative methods of scoring the pushup event, including the 30-39 age group norms published by the Cooper Institute for Aerobic Research ("Cooper Institute"), which norms derive from the largest known set of fitness data in the United States. The FBI, however, developed its own minimum passing standards because the Cooper Institute data reflect fitness norms for the general population, not the law enforcement population, which typically has a higher level of fitness than does the general public. As of 2009, the Cooper Institute norms for the 30-39 age group at the 60th percentile were 30 pushups for men and 15 pushups for women—which differ from the PFT by one pushup for women. Of course, the Cooper Institute norms also differ from the PFT in that the Cooper Institute tallies pushups completed in one minute, whereas the PFT tests pushups to exhaustion without a time limit. It is also undisputed that the average NAT is approximately 30 years old, and that when the FBI compared the PFT standards to the Cooper Institute norms in 2005, the Bureau looked to the laxer norms for 30-39 year olds, rather than those for 20-29 year olds.

Both parties' experts agree, however, that there is no mathematical equation that can predict the physiological equivalent of a number of pushups for men versus women. Rather, the only reliable way to attempt to identify equivalent standards for men and women on a pushup test is to rely on metrics such as equivalent percentile ranks, derived from either large, general databases or narrower, more-representative datasets.

6

## II.

Where, as here, the parties have filed cross motions for summary judgment, each motion must be reviewed "separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quotation marks omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets its burden, the opposing party, in order to defeat the motion, must set forth specific facts showing a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Finally, "[T]he facts, with reasonable inferences drawn," are viewed "in the light most favorable" to the non-moving party. *Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

The legal question on remand is a narrow and straightforward one: whether defendant's use of gender-normed physical fitness standards imposed a significantly greater burden on plaintiff, a male, than on women, by requiring men to show a higher level of fitness. As the Fourth Circuit put it,

> [A]n employer does not contravene Title VII when it utilizes physical fitness standards that distinguish between the sexes on the basis of their physiological differences but impose an equal burden of compliance on both men and women, requiring the same level of physical fitness of each.

*Bauer II*, 812 F.3d at 351. In other words, "Whether physical fitness standards discriminate based on sex … depends on whether they require men and women to demonstrate different levels of fitness." *Id.*

In adopting this approach, the Fourth Circuit relied principally a district court case, *Powell v. Reno*, No. 962743, 1997 U.S. Dist. LEXIS 24169 (D.D.C. July 24, 1999), and an Equal

Employment Opportunity Commission ("EEOC") decision, *Hale v. Holder*, EEOC Dec. No. 570–2007–00423X (Sept. 20, 2010). After analyzing both cases in depth, the Fourth Circuit stated that it "agree[d] with the rule enunciated in *Powell* and in *Hale*." *Bauer II*, 812 F.3d at 351. Notably, both *Powell* and *Hale* involved Title VII challenges brought by men after they had failed to become FBI special agents. And both courts enunciated the rule that the plaintiffs, to prove sex discrimination under Title VII, had to show that they faced a "significantly greater burden" of compliance with physical fitness standards than did females. *See Powell*, 1997 U.S. Dist. LEXIS 24169, at *9-10 ("Title VII allows employers to make distinctions based on undeniable physical differences between men and women ... where no significantly greater burden of compliance [is] imposed on either sex."); *Hale*, EEOC Dec. No. 570-2007-00432X, slip op. at 6 ("[I]t is clear that the physiologically-based distinctions in the PFT did not place a 'significantly greater burden' on males than on females.").[7]

These principles, applied to the undisputed factual record, point persuasively to the conclusion that the PFT did not impose a significantly greater burden on plaintiff than it did on women. Thus, for the reasons that follow, defendant's summary judgment motion must be granted, and plaintiff's must be denied.

### III.

Regardless whether analysis focuses on the PFT as a whole, or on the pushup requirement alone, the result under the "rule enunciated" in *Powell*, *Hale*, and *Bauer II* is the same—summary judgment must be awarded to defendant. *See Bauer II*, 812 F.3d at 351. This is

---

[7] As the Fourth Circuit noted, both *Powell* and *Hale* "relied largely" on the Ninth Circuit's en banc decision in *Gerdom v. Continental Airlines, Inc.*, 692 F.2d 602 (9th Cir. 1982). *Bauer II*, 812 F.3d at 348. And importantly, the *Gerdom* court found that the "key consideration" on a sex discrimination claim involving "physiologically based policies" is whether a "significantly greater burden of compliance [i]s imposed on either sex." *Gerdom*, 692 F.2d at 606, *cited favorably in Bauer II*, 812 F.3d at 349-50.

so because the undisputed factual record discloses that men and women pass the PFT at essentially identical rates, and that the normalized pushup quotas impose essentially similar burdens on both sexes. Plaintiff's discrimination claims therefore fail as a matter of law.

To begin with, the undisputed factual record reflects that the PFT as a whole does not impose a significantly greater burden of compliance on men than on women. For instance, the 2005 Grubb Report reflects that 90.2% of male NATs and 89.5% of female NATs who had taken the PFT by the seventh week of their respective training programs had passed the test. That same report also found that the marginal difference in pass rates between the sexes was statistically insignificant.[8] These findings are uncontested. Nor are they anomalies; indeed, from 2004 to 2012, 99% of both men and women—more than 6,000 NATs—passed the PFT, with no statistically significant difference between sexes. Given the standard set forth in *Bauer II*, the undisputed statistics in the summary judgment record demonstrate that the PFT does not impose a greater burden on men. If it did impose a significantly greater burden on one sex, the PFT would not produce such high and practically identical pass rates year over year.

The undisputed factual record compels the same conclusion even if the pushup event is evaluated in isolation. In this respect, it is worth repeating that the FBI set the minimum score at the 15.7th percentile for males and at the 15.9th percentile for females who had participated in the Pilot Study. That is, the FBI found in the Pilot Study that almost precisely 84% of male NATs had completed at least 30 pushups, and that almost precisely 84% of female NATs had completed at least 14 pushups. These statistics—from what the factual record discloses is a representative sample—demonstrate that the pushup test imposes the same burden on men and women.

---

[8] These data in fact reflect that it was easier for *men* to pass the PFT than it was for women.

In response, plaintiff argues that percentiles in the 2003 Pilot Study are meaningless, as they derive solely from the pilot study's class of NATs. Thus, plaintiffs argue, the percentiles may not necessarily reflect equivalent fitness levels for men and women. In this regard, plaintiff appears to identify the classic problem of accuracy versus precision. For instance, it is hypothetically possible (1) that *all* of the male NATs in the 2003 Pilot Study were in, say, the top 1% of men in terms of physical fitness, (2) that *all* of the female NATs in that study were in the top 20% of women, and (3) that therefore the FBI calibrated its gender-normed standards at significantly disparate fitness percentiles. Were that the case, the pushup requirement would require greater physical fitness from men than from women. On the other hand, in such a scenario—where, as plaintiff alleges, the pushup requirement significantly overburdens one sex—the PFT pass rates would eventually reflect that error through statistically significant disparities. But the 2005 Grubb Report and nearly a decade's worth of data from 2004 to 2012 confirm that the PFT and pushup test impose the same burden on men and women, because the pass rates for men and women are almost identical. Indeed, plaintiffs have offered no statistically significant data to suggest that there has been some recurring error over the last decade. Thus, however conceivable this hypothetical scenario may be, there is no competent evidence in the record to support it, and thus this hypothetical cannot forestall summary judgment.

But plaintiff's argument fails on a more fundamental ground because the parties' experts agree that there is no perfect, mathematical equation to predict the physiological equivalent of a number of pushups for men versus women. Instead, the only reliable way to attempt to select equivalent, gender-normed standards on a pushup test is to rely on metrics such as percentile ranks, based on either large databases or specific datasets. That is precisely what the FBI did here. Indeed, the FBI developed its minimum passing standards for the pushup event based on

what has proven to be, based on the near-identical pass rates, a representative sample of individuals—the 2003 Pilot Study NATs.

Yet, even assuming, *arguendo*, the 2003 Pilot Study NATs did not comprise an appropriate dataset to establish the PFT's pushup standards, plaintiff's preferred source of data—the Cooper Institute, which collected statistics from the general public instead of typical FBI trainees—still compels the conclusion that the pushup event does not impose a significantly greater burden on men. Notably, the PFT's pushup benchmarks correspond almost exactly to the 2009 Cooper Institute pushup norms for the 30-39 age group at the 60th percentile. Where the PFT requires men and women to perform 30 and 14 pushups, respectively, to exhaustion, the Cooper Institute 60th percentile norm is 30 pushups for men and 15 for women in a minute.[9] Put differently, the PFT deviates from plaintiff's preferred standard by a single pushup. And although in plaintiff's experience a single, untimed pushup marked the difference between passing and failing the PFT, the difference between requiring women to perform 14 or 15 pushups does not reflect a significantly greater burden on men.[10]

Once again, it must be emphasized that there is no perfect, unassailable method to predict the physiological equivalent of pushups for one sex versus another. Indeed, it is undisputed that the best method is to use a large database, like the Cooper Institute's, or a specific, more representative sample, like the 2003 Pilot Study. That the FBI created a pushup standard that

---

[9] It is worth noting that the PFT imposed a lighter burden on plaintiff than would than the Cooper Institute norms, because the Cooper Institute norms require that the number of pushups be completed in a minute, whereas the PFT is untimed.

[10] Plaintiff also argues that the 2005 Cooper Institute norms for the 50-55th percentile in the general population was 27-29 pushups for men, and 14 pushups for women. Thus, plaintiff appears to argue that the PFT's requirement than men perform 30 pushups instead of 29 constituted sex discrimination. But, once again, a single pushup here does not create a significantly greater burden on one sex versus the other.

essentially comports with both datasets does not support plaintiff's claim of a significantly greater burden. In short, plaintiff cannot show that the pushup event, even when isolated from the rest of the PFT, imposes a significantly greater burden on men than on women.

The conclusion reached here is bolstered by the two decisions on which the *Bauer II* panel chiefly relied: *Hale v. Holder*,[11] and *Powell v. Reno*.[12] *See Bauer II*, 812 F.3d at 348-51. As the Fourth Circuit observed in *Bauer II*, the *Hale* opinion rejected "a Title VII claim nearly identical to the one that Bauer sponsors: that of a male [NAT] who failed to meet the PFT's current male standards." *Id.* at 348 (citing *Hale*, EEOC Dec. No. 570-2007-00423X, slip op. at 2). Specifically, in *Hale* a former NAT alleged that the FBI discriminated against him on the basis of sex because he failed to meet the PFT's requirement that he score a point in every event. He further alleged that he "would have received passing scores … had the [FBI] scored his performance in … accordance with the fitness measures applied to female trainees." EEOC Dec. No. 570-2007-00423X, slip op. at 3. The EEOC squarely rejected this claim, concluding that the PFT—which had the same standards as in plaintiff's case here—did not impose a significantly greater burden on men. *Id.* at 4. Rather, the EEOC found that "the PFT established equivalent relative fitness standards for males and females and thereby applied nondiscriminatory fitness requirements to its trainees." *Id.* The *Hale* decision further held that the FBI's subsequent studies "demonstrate that the numerical standards for each PFT event differed for men and women only to the extent necessary to account for indisputable physiological differences between the genders," as evidenced by the fact that "the PFT pass rates for male NATs have equaled or exceeded that for their female counterparts." *Id.* at 6. Thus, it could "hardly be said that the PFT

---

[11] EEOC Dec. No. 570–2007–00423X (Sept. 20, 2010).

[12] No. 962743, 1997 U.S. Dist. LEXIS 24169 (D.D.C. July 24, 1999).

more significantly burdens males or creates barriers to their employment as S[pecial] A[gent]s." *Id.* The same is true here.

Similarly, the district court in *Powell v. Reno* concluded that the FBI's pre-PFT, five-part physical fitness test did not discriminate against a male NAT who, after failing that test, alleged sex discrimination on the ground that he would have met the FBI's "less stringent standards" imposed on female NATs. *See* 1997 U.S. Dist. LEXIS 24169, at *1. The *Powell* court granted summary judgment to the defendant, concluding that there was "no significantly greater burden of compliance" on men and thus "the application of the male standards to plaintiff was not discriminatory." *Id.* at *9. To put it succinctly, then, the two most factually apposite cases applying the relevant legal standard arrived at precisely the same conclusion as that reached here.

To e su e, plaintiff argues that these cases are not "particularly instructive." P. Br. (Doc. 200) at 19. But this contention ignores the Fourth Circuit's plain observations in *Bauer II*: (1) that "*Powell* and *Hale* specifically addressed and approved the FBI's use of gender-normed standards at the Academy and thus ea di ectly on this appeal," and (2) that *Hale* in particular involved a "claim nearly identical to the one that Bauer sponsors[.]" 812 F.3d at 348. To be sure, plaintiff correctly notes that in *Hale* there was no evidence offered in opposition to the FBI's summary judgment motion, and that the summary judgment record there showed that "mere failure to pass the PFT … would not be sufficient to justify termination of a NAT's employment." EEOC Dec. No. 570-2007-00423X, slip op. at 2. But these distinctions are immaterial. First, the fact that plaintiff, unlike the claimant in *Hale*, actually opposes summary judgment does not itself create a genuine dispute of fact. Second, here, unlike in *Hale*, the record *does* demonstrate that a NAT's failure to pass the PFT was a sufficient justification for termination of employment. That is precisely what the document plaintiff received at the outset

13

of his training—the "Rules, Regulations and Requirements at the FBI Academy for New Agent Trainees"—states. Plaintiff's attempts to distance this matter from the cases expressly endorsed in *Bauer II* are thus unpersuasive.

Plaintiff offers several other arguments in support of his motion, and in opposition to defendant's motion, for summary judgment. None is convincing. First, plaintiff asserts that from 2005-2012, 33 men and 2 women were dismissed from the NAT training program solely because they failed the PFT. In this respect, plaintiff observes that 22 of those men and none of the women failed the PFT solely because of the pushup event. In plaintiff's view, these data reflect a significantly greater burden on men. There are several fatal flaws in this argument. Most important, plaintiff does not even attempt to determine whether those numbers are statistically significant or instead due to pure chance.[13] Moreover, plaintiff's focus on the years between 2005 and 2012 skews the results by omitting 2004, a year in which five female NATs failed the pushup event. Plaintiff's numbers also exclude the total number of NATs who have taken the PFT, which further distorts his results and obfuscates crucial context—namely, the true failure rate among NATs—necessary to determining whether there is indeed a significantly greater burden on men than on women. After all, the undisputed, statistically sound data demonstrate that 99% of both men and women pass the PFT, including its pushup event.

---

[13] *See EEOC v. Am. Nat'l Bank*, 652 F.2d 1176, 1191 (4th Cir. 1981) ("The difference between actual ('observed') numbers of the protected group in … a sample and the number that would be 'expected' in a perfectly proportional process of selection from the appropriate pool can … be expressed in numbers of standard deviations. In turn, standard deviations can be expressed in terms of the mathematical probability that chance is the cause of the disparities … measured. As standard deviations increase numerically, the probability of chance as the cause of revealed underrepresentation of course diminishes."); *see also Ottaviani v. State Univ. of N.Y.*, 875 F.2d 365, 371 (2d Cir. 1989) ("Not all disparities … are probative of discrimination. Before a deviation from a predicted outcome can be considered probative, the deviation must be 'statistically significant.'").

Plaintiff's analysis therefore does not create a genuine dispute of fact sufficient to forestall summary judgment.

Second, plaintiff underscores two of the FBI's policy changes in 2004 and 2005, where the Bureau briefly used two different methods for counting pushups during the PFT. Specifically, one year the FBI used mechanical counters, and the other year the FBI had NATs tally their fellow trainees' pushups. But these policy changes are inapposite. Not only did the FBI apply these methods equally to men and women—belying any claim of sex discrimination—but the Bureau had long abandoned these two counting methods before plaintiff arrived at the Academy in 2009. By the time plaintiff became a NAT, the established practice was to have instructors count each NAT's pushups.[14] These policy changes are simply irrelevant to plaintiff's sex discrimination claim.

Third, plaintiff contends that the PFT was not age-normed to account for differences in a given NAT's age. This argument is also meritless, as plaintiff has not alleged an age discrimination claim. In fact, the undisputed factual record discloses that the FBI *did* consider the Cooper Institute's 30-39 age range, and gave NATs the benefit of the doubt by imposing standards correlative to 30-39 year olds, as opposed to a younger age range. Thus, plaintiff's contention is not only immaterial, but also incorrect.

Fourth, plaintiff argues that the FBI disregarded the Cooper Institute norms that, in plaintiff's view, indicate that the PFT standards are not equivalent for men and women. This argument is unpersuasive because the FBI *did* consider the Cooper Institute norms and, as explained above, those norms do not support plaintiff's claim that he was subjected to a significantly greater burden than were women.

---

[14] *See supra* note 4.

Finally, plaintiff asserts that the FBI cannot justify its use of a 30-pushup quota as a bona fide occupational qualification ("BFOQ"). Although the opinion in *Bauer I* agreed,[15] plaintiff's attempt to reprise a BFOQ argument here places the cart in front of the horse. That is, an employment practice need not be justified by a BFOQ—and a BFOQ defense need not be reached—unless plaintiff first shows a significantly greater burden of compliance on men. *See, e.g.*, *Earwood Continental SE Lines, Inc.*, 539 F.2d 1349, 1351 n.5 (4th Cir. 1976) ("Since we hold that [defendant]'s regulation does not discriminate in violation of Title VII, we need not consider whether it involves a [BFOQ]."). Here, because the undisputed factual record and the applicable legal standard foreclose a finding of sex discrimination, plaintiff's argument regarding the lack of a BFOQ is unavailing.

### III.

There is no questioning plaintiff's bona fide desire to become an FBI special agent. Indeed, he continues to serve this country as an FBI analyst. And it may well be the case that the Bureau's treatment of plaintiff could fairly be described as shabby. But the governing legal principles, applied to this summary judgment record, point convincingly to the conclusion that that the FBI did not impose a greater burden on plaintiff than it did on women. Plaintiff's sex

---

[15] As stated in *Bauer I*, a BFOQ defense requires that the challenged employment policy be "an objective, verifiable requirement" that "concern[s] job-related skills and aptitudes." *Bauer I*, 25 F. Supp. 3d at 862 (quoting *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 203 (1991)). After determining that plaintiff had shown sex discrimination, the *Bauer I* opinion further concluded that "[a]lthough defendant … successfully demonstrated that the PFT provides an objective, verifiable measure of physical fitness, defendant … failed to meet the second BFOQ requirement—that the PFT is properly focused on job-related skills and aptitudes." *Id.* at 863 (quotation marks omitted). In this respect, the FBI's explanations for implementing the PFT were "inconsistent" and, oddly, the Bureau did not impose physical fitness tests on incumbent special agents. *See id.* After plaintiff initiated this lawsuit, however, the FBI began requiring current agents to complete a physical fitness test similar to the PFT. *See, e.g.*, *Bauer v. Sessions*, No. 1:13-cv-93 (E.D. Va. Mar. 24, 2017) (Hr'g Tr.) at 11:19-22. The Fourth Circuit did not address the BFOQ defense in its opinion in *Bauer II*.

discrimination claim therefore fails. Accordingly, defendant's summary judgment motion will be granted, and plaintiff's cross motion will be denied.

An appropriate Order will issue.

Alexandria, Virginia
May 25, 2017

/s/
T. S. Ellis, III
United States District Judge